# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 15, 2012          Decided February 15, 2013

No. 11-1422

NEW ENGLAND POWER GENERATORS ASSOCIATION, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

GEORGE JEPSEN, ATTORNEY GENERAL FOR THE STATE OF
CONNECTICUT, ET AL.,
INTERVENORS

Consolidated with 11-1465

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

*John Lee Shepherd* argued the cause for petitioner New
England Power Generators Association, Inc.   With him on the
briefs was *John N. Estes III.   Paul F. Wight* entered an
appearance.

*John S. Wright*, Assistant Attorney General, Office of the
Attorney General for the State of Connecticut, argued the cause
for State Petitioners. With him on the briefs were *Michael C.*

2

*Wertheimer*, Assistant Attorney General, *Jesse S. Reyes*, Assistant Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, and *Lisa Fink*.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Lona T. Perry*, Senior Attorney.

Before: TATEL, BROWN, and GRIFFITH, *Circuit Judges*.

BROWN, *Circuit Judge*: The Federal Energy Regulatory Commission must ensure the rates charged for electric generation capacity are "just and reasonable." Federal Power Act (FPA) § 205(a), 16 U.S.C. § 824d(a). Until recently, only two types of rates were involved: tariff rates and contract rates. FERC's review of tariff rates is subject to considerable discretion. On the other hand, unless a contract rate is contrary to the public interest, FERC must presume it to be just and reasonable under the *Mobile-Sierra* doctrine, a principle that began with two eponymous Supreme Court precedents: *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.* (*Mobile*), 350 U.S. 332 (1956), and *Fed. Power Comm'n v. Sierra Pac. Power Co.* (*Sierra*), 350 U.S. 348 (1956).

The debut of capacity auctions poses a new challenge. In this case FERC reviewed rates resulting from an auction process and concluded that though the rates are not contract rates, they warrant the *Mobile-Sierra* presumption anyway—a move that upset two groups of petitioners for opposite reasons. The New England Power Generators Association ("NEPGA") likes the result but not the reasoning: it argues the auction results, as contract rates, *must* receive the *Mobile-Sierra* presumption. Another group, comprising the Maine Public Utilities Commission and the Attorneys General of Massachusetts and Connecticut (collectively, the "State

Petitioners"), supports much of FERC's reasoning but not the result: they contend that because the auction results are not contract rates, FERC *cannot* presume them just and reasonable. We dismiss NEPGA's petition for lack of standing and deny the State Petitioners' petition on the merits.

I

A

Regulated energy suppliers file compilations of their rate schedules, called "tariffs," with FERC. *See Morgan Stanley Capital Grp., Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 531 (2008). Suppliers must abide by these tariffs when providing service to electricity purchasers, though they may change their tariffs if they afford FERC advance notice. *See* 16 U.S.C. § 824d(c), (d); *Morgan Stanley*, 554 U.S. at 531. Along with the unilateral filing of tariffs, the FPA also allows suppliers to set rates with individual purchasers via bilateral contract, though these contracts must also be filed with FERC before going into effect. *See Morgan Stanley*, 554 U.S. at 531. All rates, whether determined by tariff or contract, must be "just and reasonable." 16 U.S.C. § 824d(a). This standard entitles FERC to some discretion, and the agency "traditionally reviewed and set tariff rates under the 'cost-of-service' method, which ensures that a seller of electricity recovers its costs plus a rate of return sufficient to attract necessary capital." *Morgan Stanley*, 554 U.S. at 532.

Though bilateral contracts and unilateral tariffs offer separate methods of rate-setting, a seller cannot abrogate a contract rate simply by filing a new tariff with FERC. *See Mobile*, 350 U.S. at 336–37. Nor may FERC conclude a new tariff supersedes a contract rate just because the latter would not qualify as "just and reasonable" under the cost-of-service

method; rather, FERC, pursuant to the *Mobile-Sierra* doctrine, may only upset such a contractually determined rate when "the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Sierra*, 350 U.S. at 355; *see also Morgan Stanley*, 554 U.S. at 533–35.

B

We adopt the facts as previously summarized in *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 130 S. Ct. 693 (2010), and *Me. Pub. Utils. Comm'n v. FERC* ("*MPUC I*"), 520 F.3d 464 (D.C. Cir. 2008) (per curiam):

In capacity markets, transmission providers pay generators for the option to buy a quantum of power rather than directly purchasing wholesale electricity. *NRG*, 130 S. Ct. at 697. As a failsafe, transmission providers typically purchase more capacity than necessary to satisfy expected demand. *Id.* That way, if a spike in demand occurs, customers will not experience a power interruption.

For some time, the situation in New England proved precarious, with capacity supplies only barely satisfying regional demand. *Id.* To mitigate this predicament, several generators sought to enter into "reliability must-run" contracts with the New England Independent System Operator ("ISO").[1]

---

[1]An ISO is an independent company that "assume[s] operational control—but not ownership—of the transmission facilities owned by its member utilities . . . . [and] provide[s] open access to the regional transmission system to all electricity generators at rates established in a single, unbundled, grid-wide tariff that applies to all eligible users in a non-discriminatory manner." *Midwest ISO Transmission*

These contracts would allow generators to recover their full cost of service as a means of guaranteeing their continued operation in areas suffering from supply shortages. *See Devon Power LLC*, 103 FERC ¶ 61,082, 61,266–68 (2003). FERC denied the generators' request, limiting recovery to certain maintenance costs going forward. *Id.* at 61,266. FERC also directed the ISO to file a mechanism for setting different prices for separate subregions within New England depending on their capacity needs. *See id.* at 61,271. The ISO response met with some opposition, and FERC instituted proceedings for the parties to negotiate a settlement. *See Devon Power LLC*, 113 FERC ¶ 61,075, 61,271–72 (2005). A settlement agreement endorsed by all but 8 of the 115 negotiating parties was filed in March 2006, and FERC adopted it. *See Devon Power LLC*, 115 FERC ¶ 61,340, 62,304, 62,306 (2006).

Central to the settlement agreement is the "Forward Capacity Auction," at which generators commit themselves to selling a certain amount of capacity at a particular price three years in advance. *Id.* at 62,306. The Forward Capacity Auction is a "descending clock auction," in which the ISO, after announcing a starting price, gradually reduces its offered price until the capacity bids equal the amount the ISO determined is necessary to guarantee grid reliability. *See id.* at 62,306–07; *see also PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 206 (D.C. Cir. 2011). Transmission providers such as public utilities ultimately purchase the capacity, paying for a portion of the capacity proportionate to their peak loads, though transmission providers may also self-supply to meet their capacity obligations. *Devon Power LLC*, 115 FERC at 62,307. The settlement agreement also

*Owners v. FERC*, 373 F.3d 1361, 1364 (D.C. Cir. 2004) (internal quotation marks omitted).

prescribed "separate but simultaneous auctions" for different subregions based on their unique capacity needs.[2]  *Id.* Additionally, the settlement specified challenges to the rates set by the Forward Capacity Auction would be reviewed under *Mobile-Sierra*'s public interest standard, "whether the change is proposed by a Settling Party, a non-Settling Party, or the FERC acting *sua sponte*."  *Id.* at 62,333.   Several objectors to the settlement agreement petitioned this Court for review of FERC's decision.   Concluding that "the *Mobile–Sierra* doctrine is designed to ensure contract stability *as between the contracting parties—i.e.*, to make it more difficult for either party to shirk its contractual obligations," we held the settlement's *Mobile-Sierra* provision inapplicable to noncontracting third parties.  *See MPUC I*, 520 F.3d at 479.

The Supreme Court reversed, however, and explained that *Mobile-Sierra*'s animating purpose—the promotion of stable energy supply arrangements—required application of the public interest standard to both contracting parties and third parties.  *See NRG*, 130 S. Ct. at 700–01.  Rejecting an interpretation of *Mobile-Sierra* as merely an application of contract law, the Court wondered, "[I]f FERC itself must presume just and reasonable a contract rate resulting from fair, arms-length negotiations, how can it be maintained that noncontracting parties nevertheless may escape that presumption?"  *Id.* at 700.  After holding the *Mobile-Sierra* presumption applicable to any party challenging a contract rate, the Supreme Court noted uncertainty as to whether the prices set by the Forward Capacity Auctions were in fact contract rates and remanded the case.  *See id.* at 701.  With

---

[2] Though no longer relevant in this case, because the auctions were set to be conducted three years before the capacity would be needed, a fixed payment schedule governed this initial transition period. *See Me. Pub. Utils. Comm'n v. FERC* ("*MPUC II*"), 625 F.3d 754, 757 n.1 (D.C. Cir. 2010).

the case once again before our court, FERC's counsel declared that the Forward Capacity Auctions did not actually produce contract rates, but that the agency nevertheless had discretion to cloak the auction rates in *Mobile-Sierra*'s public interest mantle. *See MPUC II*, 625 F.3d at 759. We concluded FERC failed to articulate a justification for this position in the underlying orders and returned the case to the agency to afford an opportunity to address the question. *Id.* at 759–60; *see SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

On remand, FERC endorsed the position its counsel had already adopted: the Forward Capacity Auction rates were not technically contract rates for the purpose of *Mobile-Sierra*, but because they "possess certain characteristics of contracts," the agency would, as an exercise of its discretion, enforce the settlement agreement's provision calling for application of the public interest standard when reviewing the rates. *Devon Power LLC*, 134 FERC ¶ 61,208, 62,044 (2011); *see also Devon Power LLC*, 137 FERC ¶ 61,073 (2011) (Order Denying Rehearing). This decision appears to have satisfied no one.

II

FERC did not challenge NEPGA's standing to bring this petition, but because Article III standing is a prerequisite to a federal court's exercise of jurisdiction, we are obliged to raise the issue even when the parties do not. *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). To have standing, a petitioner must, at a constitutional minimum, satisfy three requirements: (1) suffer an "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) draw a causal connection between the injury and the agency action complained of; and (3) seek relief that is likely to redress the injury. *Lujan v.*

8

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).   The injury prong is missing here.

NEPGA may have preferred FERC's wholehearted endorsement of the Forward Capacity Auction rates as contract rates, but its desired outcome—application of *Mobile-Sierra*'s public interest standard—has already been achieved.   That FERC may one day attempt to alter its position is insufficient injury to NEPGA now, for neither a FERC decision's legal reasoning nor the precedential effect of such reasoning confers standing unless the substance of the decision itself gives rise to an injury in fact.   *See Wis. Pub. Power Inc. v. FERC*, 493 F.3d 239, 268 (D.C. Cir. 2007) (per curiam).   We have recognized an exception to this principle under certain narrow circumstances where "the petitioner is not merely quibbling over the agency's rationale in a case in which it has prevailed" but is instead arguing the agency "lacked jurisdiction even to consider this type of case."   *Int'l Bhd. of Elec. Workers v. ICC*, 862 F.2d 330, 334 (D.C. Cir. 1988).   This, however, is not such a case: the precedent going forward—that *Mobile-Sierra* applies to the Forward Capacity Auction rates—is precisely the outcome NEPGA desires.   NEPGA simply wishes FERC had been more definitive in its support for this result.

NEPGA offers a number of theories, all too hypothetical to support standing.   First, NEPGA claims FERC's decision "will increase suppliers' costs of capital because 'uncertainties regarding rate stability and contract sanctity can have a chilling effect on investments.'"   NEPGA Br. 16 (quoting *Morgan Stanley*, 554 U.S. at 551.   The argument is unavailing.   In essence, NEPGA's challenge to the orders is predicated not on any injury legitimately traceable to the order, but on the potential for FERC to issue future, contrary orders.   And in any event, broad-based market effects stemming from regulatory uncertainty are quintessentially conjectural, and it is

difficult to imagine a FERC action that would not confer standing under this theory. *See Shell Oil Co. v. FERC*, 47 F.3d 1186, 1202 (D.C. Cir. 1995) (rejecting a party's attempt to establish standing based on a conceivable yet "hypothetical" scenario involving future business relations).

NEPGA has cited no factual support for its claim of economic harm, nor has it sought to supplement the record. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) ("When the petitioner's standing is not self-evident . . . the petitioner must supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review."). That is not to say the impact of an agency decision on a company's ability to raise capital is never sufficient to ground standing. But that impact must be concrete, tethered to something more than the possibility an agency may one day reverse its position. *Cf. CNG Transmission Corp. v. FERC*, 40 F.3d 1289, 1293 (D.C. Cir. 1994) (finding injury where FERC's decision required the petitioner "to record a $7.1 million loss in its 1993 financial statements, adversely affecting the company's bottom line, reducing the earnings available for dividend payments and investment, and damaging the company's standing in the financial markets by reducing company value and making it more difficult (and more costly) to raise capital."). It would be a strange thing indeed if uncertainty were a sufficiently certain harm to constitute an injury in fact.

Next, NEPGA complains the FERC orders "deny market participants their long-recognized right to determine for themselves the standard of review that will apply to their commercial arrangements." NEPGA Br. 16. This is an argument on the merits, not a basis for standing. Missing here is an explanation of *how* the supposed alteration to existing doctrine has in fact injured NEPGA.

Finally, NEPGA asserts that FERC's decision "voids the fundamental concomitant rights of contract holders to sue on the contract, either at FERC for jurisdictional claims or in the courts for other claims, and to enforce their claims in bankruptcy courts." NEPGA Br. 16–17 (internal citations omitted). Aside from the fact that a regulatory decision's precedential effect does not confer standing, NEPGA exaggerates the impact of FERC's orders. That FERC has decided the auction rates are not contract rates for *Mobile-Sierra* purposes does not, of its own force, foreclose any contract or bankruptcy claim NEPGA's members may one day choose to bring. To bolster its point, NEPGA cites *Consumers Energy Co. v. FERC*, 428 F.3d 1065 (D.C. Cir. 2005), but while that case also involved issues related to standing and contracts, the similarities to NEPGA's circumstances end there. In *Consumers Energy Co.*, we held that a petitioner could have standing to challenge an agency decision concerning another party when, because of a private contractual relationship, the petitioner's interests were directly implicated by that decision. *See id.* at 1069. The case said nothing of a party's standing to challenge an agency decision because it expressed doubt as to the existence of an underlying contract.

NEPGA's asserted injuries are overly speculative and so inadequate to establish standing. We therefore lack jurisdiction to review NEPGA's petition and must dismiss it.

III

Agreeing with FERC that the Forward Capacity Auction results are not contract rates, the State Petitioners nevertheless object to FERC's decision to review the rates under *Mobile-Sierra*'s public interest standard. Assuming, without

deciding, that the auction rates are not contract rates, we conclude the State Petitioners are wrong. Their argument boils down to a single misconception: because the existence of a contract rate mandates application of the *Mobile-Sierra* presumption, the absence of a contract rate precludes it. An example of the logical fallacy "denying the antecedent,"[3] the State Petitioners' reasoning is invalid.

As the Supreme Court has clarified, *Mobile-Sierra*'s public interest standard is an instance of (rather than an exception to) the FPA's just and reasonable standard. *Morgan Stanley*, 554 U.S. at 545. Application of public interest review is simply one method by which FERC may assure itself a rate is just and reasonable, just as the cost-of-service method, which the State Petitioners dub "ordinary" just and reasonable review, is another. Typically, reasonable agency interpretations of ambiguous statutory terms like "just and reasonable" are already subject to judicial deference under the regime set forth in *Chevron, U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). And, just in case there existed any uncertainty whether *Chevron* applied here, the Supreme Court has also explained, "The statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions. We have repeatedly emphasized that the Commission is not bound to any one ratemaking formula." *Morgan Stanley*, 554 U.S. at 532 (internal citations omitted). In challenging FERC's decision, therefore, the presumption the State Petitioners must rebut is a daunting one.

The only question, then, is whether FERC exceeded the bounds of its considerable discretion by adopting the public

---

[3] "P ⊃ Q" does not mean "¬P ⊃ ¬Q."

interest standard for deciding whether a given Forward Capacity Auction rate is just and reasonable. There is no reason to believe it has. FERC offered ample reasoning in support of its position, recognizing that the auction rates exhibit many of the indicia of contract rates: not only did FERC conclude the rates "provide a market-based mechanism to appropriately value capacity resources based on their location," but, as FERC explained, "rates disciplined by a market are consistent with the FPA's requirements." *Devon Power LLC*, 134 FERC at ¶ 62,045. Whether the auction results are contract rates or not, FERC's determination that the logic of *Mobile-Sierra* still applied is "a reasonable choice within a gap left open by Congress" and so within the purview of the agency's discretion under § 205(a) of the FPA. *Chevron*, 467 U.S. at 866. We reject the State Petitioners' argument to the contrary.

IV

Because NEPGA lacks standing, we dismiss its petition for review. Having rejected the merits of the State Petitioners' arguments, we deny their petition for review.

*So ordered.*