In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 13-2326, 14-3023

PIONEER TRAIL WIND FARM, LLC, *et al.*,

*Petitioners*,

AMERICAN WIND ENERGY ASSOCIATION, *et al.*,

*Intervening Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

MIDCONTINENT INDEPENDENT SYSTEM OPERATOR, INC., *et al.*,

*Intervening Respondents*.

_____

Petitions for Review of Orders of the
Federal Energy Regulatory Commission
Nos. ER11-3326-001, ER11-3326-002, ER11-3327-001,
ER11-3327-002, ER11-3330-001, and ER11-3330-002

_____

ARGUED APRIL 20, 2015 — DECIDED AUGUST 19, 2015

_____

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and DARRAH, *District Judge*.*

WOOD, *Chief Judge*. Before deciding to build a power plant, energy companies and the system operator of an electrical grid must calculate the anticipated cost of connecting the proposed plant to the grid. These determinations occur in a highly regulated environment. Not surprisingly, sometimes the calculations need to be corrected. This case deals with who should bear the costs of additional upgrades to the grid when the initial studies of the costs of connection contained an error. Two wind-farm companies argue that the Federal Energy Regulatory Commission (FERC or the Commission) issued unreasoned orders when it assigned the corrected costs of connection to the wind farms that wanted to connect to the grid rather than to the grid's system operator, which was the party that made the mistake. Our task is to decide whether the Commission's decisions to impose the costs on the connecting parties and to require a certain methodology were arbitrary and capricious under Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). We conclude that the Commission's decisions pass muster, and thus we deny the petitions for review.

## I

Pioneer Trail Wind Farm, LLC (Pioneer), owns and operates a 150-megawatt wind-powered electric generation facility in Illinois. Settlers Trail Wind Farm, LLC (Settlers), owns a similarly sized facility, also in Illinois. Both Pioneer and Settlers are owned by companies that are in turn owned by a

---

*Hon. John W. Darrah of the Northern District of Illinois, sitting by designation.

German company called E.ON SE. (The "SE" stands for "societas europaea," which is the term given to companies that register under the European Union's European Company Statute rather than under national law. See EUROPEAN COMM'N, *The European Company – Your Business Opportunity?*, http://ec.europa.eu/internal_market/company/societas-europaea/index_en.htm, (all websites last visted Aug. 12, 2015).) According to E.ON's website, its power companies serve 33 million customers worldwide. See E.ON, *Who We Are. An Overview.*, http://www.eon.com/en/about-us/profile.html. We often refer to Pioneer and Settlers collectively as the Generators in this opinion.

Midcontinent Independent System Operator, Inc. (MISO), was formed in 1998 by several independent transmission-owning utilities. Since its creation, MISO has linked up the transmission lines of the member utilities into a single interconnected grid that stretches across 11 states. The Generators wish to be connected to the transmission system of Ameren Illinois Company (Ameren), which is run by MISO. Ameren oversees 4,500 miles of electric transmission lines and approximately 45,400 miles of distribution lines in downstate Illinois; it serves roughly 1.2 million customers in Illinois.

In order to put the questions before us in context, some background on the interconnection process is essential. In layman's terms, we are talking about the regulatory hoops that a power plant must jump through in order to hook up to a grid. The Federal Power Act grants FERC jurisdiction to oversee "matters relating to generation … and … the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce" because Congress has found such oversight to be "necessary in

the public interest." 16 U.S.C. § 824(a). In 2003, FERC standardized the generation interconnection process, to which we reluctantly refer as the GIP, following the industry jargon. Under the GIP, the interconnection customers, such as Pioneer and Settlers, submit requests to the grid operator—in this case, MISO. MISO then produces studies to assess the impact of the projects on the grid. These studies identify what additional upgrades are needed to ensure that those additional connections do not adversely affect the grid. These studies also inform interconnection customers what the cost of the upgrades will be. This step is supposed to enable the customers to decide if, in fact, they want to be connected to the grid or perhaps even build the plants at all. The interconnection customers cover the cost of MISO's studies.

Each case involves three separate studies. First, the grid operator prepares and sends to the interconnection customers the "base case," which gives them an overview of the system conditions. Second, the grid operator prepares a "system impact study," which includes a preliminary list (with non-binding cost estimates) of network upgrades required by the proposed project. At this point, the customers may choose whether to proceed. If they go forward, MISO performs the third study, called an "interconnection facilities study." This sets out the nature and cost of the necessary network upgrades, as well as any information about pending upgrades that are entered into MISO's interconnection queue. If another project is entered before the customer's project, then the second customer could end up bearing the costs of the earlier project. That is because projects higher in the queue are included in the baseline against which the lower-queued project is assessed.

If the interconnection customer chooses to proceed in light of these studies, the grid operator provides the customer and the interconnecting transmission system owner with a Generator Interconnection Agreement (Agreement), which the parties must execute. The Agreement contains the specific upgrades and estimated costs identified in the studies. Once the parties execute the Agreement, it is effective under Section 205 of the Federal Power Act. See 16 U.S.C. § 824d.

With that background, we detail the specific process that took place here between the interconnection customers—the Generators—and the grid's system operator, MISO. In February 2009, MISO and Ameren entered a "study services agreement" in which Ameren agreed to perform the studies of the impact of the Generators' interconnection requests. Pioneer and Settlers signed their Agreements on February 5, 2010, with projects scheduled to begin in June and September of 2011. The Settlers Agreement included roughly $6 million in network upgrades, while Pioneer's Agreement required no network upgrades.

Everything was apparently proceeding smoothly until April 29, 2010, when MISO notified the Generators that the studies included a "significant error" that failed to include upgrades to a higher-queued project in the vicinity of the two companies' proposed wind farms. The inadvertently omitted project was a 30-megawatt upgrade to another wind farm in Benton County. MISO told the Generators that something had to give: they would either have to agree to fewer megawatts (120 megawatts each) or pay for additional network upgrades estimated to cost $11.5 million. On May 11, 2010, the Generators informed MISO that they rejected both options: the additional network upgrades, they asserted,

were not their responsibility, and so they claimed they were entitled to proceed with their 150-megawatt wind farms.

MISO did not acquiesce in their position. Instead, in November 2010, it informed both companies that they would need to pay for $10 million in additional network upgrades and $1.5 million in common use upgrades before they could interconnect. MISO presented superseding Agreements to both Pioneer and Settlers. The revised Agreements required the companies to pay for both the original and the additional network upgrades; they also provided for a Multi-Party Facilities Construction Agreement to address the common use upgrades. The two companies refused to sign. They asked MISO instead to file the superseding Agreements with FERC, so that it could resolve the dispute about who had to pay for the upgrades. MISO did so on April 8, 2011, and April 11, 2011. Before the Commission, the Generators protested that they should not be responsible for the cost of the additional network upgrades, and Ameren filed an answer, claiming it was not the source of the study error. The Commission found that the Generators should pay for the additional network upgrades and denied the companies' requests for rehearing.

The Generators also contest another aspect of FERC's decision. The original Agreements (the ones that failed to account for the higher-queued wind farm) included a pricing scheme (Option 1), under which the Generators were to fund the cost of the network upgrades before construction, MISO would refund 100% of the upgrade costs *after* construction, and the Generators would then pay for the upgrades monthly through a "network upgrade charge." In the course of a different FERC proceeding, however, the Commission

granted MISO's request to do away with Option 1 pricing and replace it with Option 2. Under Option 2 pricing, the customer pays for only the unreimbursable cost of the upgrades before construction, and the transmission owner retains the funds. Despite doing away with Option 1 for future Agreements, the Commission grandfathered Option 1 pricing for the original network upgrades and applied Option 2 pricing only to the upgrades added in light of MISO's error.

Pioneer and Settlers filed petitions seeking review of the Commission's decisions to impose the costs of the additional upgrades on them and to apply Option 1 pricing to the original upgrades (they would prefer Option 2 pricing across the board, for reasons we need not explore). We granted motions to intervene as petitioners from the American Wind Energy Association (AWEA), a national trade association that represents wind power project developers and other companies involved in the wind power industry, and Wind on the Wires (WOW), a non-profit that collaborates with AWEA on wind farm work in the Midwest. Ameren and MISO have intervened as respondents.

## II

The Generators are seeking review of FERC's decisions under Section 313(b) of the Federal Power Act, 16 U.S.C. § 824*l*(b). That statute provides that the Commission's findings of fact "if supported by substantial evidence, shall be conclusive." It does not otherwise specify the standard of review, and so the applicable standard is found in Section 706(2)(A) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), which instructs a reviewing court to uphold an agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." While deferential, these standards are not toothless. We must inquire whether FERC "examined the relevant data and articulated a rational connection between the facts found and the choice made." *Eastern Ky. Power Co-op, Inc. v. FERC*, 489 F.3d 1299, 1306 (D.C. Cir. 2007) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The petitioners have the burden of showing "that the Commission's choices are unreasonable and … not within a 'zone of reasonableness.'" *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1084 (D.C. Cir. 2002) (citation omitted).

## A

We begin with the Generators' primary challenge, which is to the Commission's decision to allocate to them the cost of system upgrades that are necessary to accommodate their new 150-megawatt facilities. In so doing, FERC was following FERC Order No. 2003, in which it takes the position that when an interconnection customer (typically a generator such as Pioneer or Settlers) is the "but-for cause" of network upgrades, it is appropriate to have that customer assume the costs of the necessary upgrades. Consistently with that policy, the order allows regional system operators to implement participant funding, under which the costs of network upgrades fall on the interconnecting customer. MISO did this in 2006.

Not surprisingly, modifications to the grid are often made to accommodate the change in power transmission brought about by new plants. "To the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred, as without the expectation of its contributions the facilities might not have been built, or might have been delayed." *Ill. Commerce*

*Comm'n v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009). While the Commission is "not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits," *id.*, here the Generators are the primary utilities that stand to benefit from being connected to the grid. See *Old Dominion Elec. Co-op., Inc. v. FERC*, 518 F.3d 43, 51 (D.C. Cir. 2008) (upholding FERC's cost allocations of interconnection facilities to the interconnection customers "when facilities would not have been built but for the interconnection request"). The parties acknowledge that the additional upgrades, first neglected and later noticed by MISO, are required.

In administering the regulatory process of updating an electrical grid, FERC needs a way to handle inevitable mistakes of fact. The question is how to think about this problem. The Generators argue that the legal framework within which we should answer the question is that of contract: they each had one Agreement; it was premised on a mistake of fact; and now a new Agreement is needed. FERC rejects the contract model and contends that the proper model is regulatory. We think that FERC has the better of this debate. It is true that the Generator Interconnection Agreements run between the interconnection customer (a generator), a transmission owner, and a transmission provider (MISO), but that is not the end of the matter. The parties are not free to contract as they wish; instead, they must structure their relationship within the elaborate regulatory regime that FERC has created. This case illustrates the point well: Pioneer and Settlers *refused* to sign the revised Agreements. They asked MISO instead to refer the matter to FERC, which MISO did. After proceedings in which everyone was heard, FERC decided that the cost should fall on the Generators.

This was a regulatory decision. Indeed, every step leading to an Agreement is dictated by regulations: MISO must connect new power plants to the grid in accordance with the Federal Power Act and its implementing regulations; it must conduct (or contract for) the three types of studies described above; and it must accept the interconnection terms FERC dictates, when FERC has to become involved.

Even if we were to focus on the contract-like aspects of the relationship, the Generators have problems. The record fails to show that they relied on the original, mistaken studies. There is no evidence that the added cost of the corrected upgrades was a dealbreaker for either Pioneer or Settlers's project. MISO gave them the opportunity to avoid the extra cost for the additional upgrades and instead reduce the output (to 120 megawatts) of the wind farms so as to not overload the system. They did not show why this would have made their farms economically unsustainable. They also had an exit option. The results of the system impact and interconnection facilities studies are designed to give companies the opportunity to withdraw from a proposal; the Generators could have opted to do so once they learned of the additional upgrades that were necessary to avoid overloading the existing electrical grid. Finally, they always understood (or should have understood) that upgrades required by another project in the queue could cause exactly the kind of problem that occurred here. (We note that the Generators apparently went ahead and built their wind farms despite this dispute. That fact has no effect on our analysis.)

We do not deny that the amount of money at issue, $11.5 million, is significant. It is also possible, in another case, that a more developed record might demand a different ap-

proach. For instance, had there been evidence in the record about the cost of a proposed wind farm, the Commission initially, and now our court, would have had a better sense of how much the additional upgrades drove up the cost of construction. Our case is devoid of such evidence, and so we lack a benchmark against which to measure the cost of the mistake. If the record before FERC had demonstrated that the difference in the interconnection costs turned a profitable enterprise into a losing one for both companies, it is possible that FERC would have entered a different order. If it had entered the same order, there might have been a stronger argument for the proposition that the order was arbitrary. This is all speculation, however. We see nothing in evidence suggesting that the facts FERC found are not supported by substantial evidence, nor do we see the kind of legal error that requires us to set aside its order.

We find further support for this conclusion in another point the Commission makes. It observes that there is nothing in the regulations that suggests it cannot modify agreements even if one party does not consent *and* the parties had not contemplated who would bear the cost of an error in the studies. That puts the Generators in a difficult spot, because they cannot point to something in the Agreements or FERC precedent that suggests they *cannot* be held liable for those costs. Article 11.3.1 of the Agreement lists aspects of the system configuration for which the system operator (MISO) is entitled to change the tariff without FERC's approval. Article 30.11, "the reservation of rights" section of the Agreement, allows MISO or Ameren "to make a unilateral filing with FERC to modify this [Agreement] with respect to any rates, terms, and conditions, classifications of service, rule or regulation under Section 205 of the Federal Power Act"; it also

allows Pioneer and Settlers "to make a unilateral filing with FERC to modify this [Agreement] pursuant to Section 206 or any other applicable provision of the Federal Power Act and FERC's rules and regulations thereunder." The phrase "a unilateral filing with FERC" appears to be a clumsy way of saying that MISO or Ameren can go back to FERC and seek the agency's modification of the Agreement. If they do so, the end result is still a regulatory order, not an arms-length agreement.

Finally, the Generators contend that FERC's decision to impose the costs of the mistake on them violates the filed rate doctrine. The filed rate doctrine, as the name suggests, requires utilities to charge the rate that is on file with the relevant regulatory agency. See *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (defining the doctrine as one that "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority"). In order to evaluate the Generators' argument, it is helpful to recall why the doctrine exists: "[to] preserv[e] the agency's primary jurisdiction over reasonableness of rates," "to insure that regulated companies charge only those rates of which the agency has been made cognizant," and to "prevent[] the Commission itself from imposing a rate increase for [electricity] already sold." *Id.* at 577–78. The filed rate doctrine is intended to bind both the parties and the agency (here, FERC) to the rate on file.

Nothing that happened in this case imperiled FERC's primary jurisdiction, hid information from FERC, or imposed a retroactive fee on electricity already sold. Instead, what happened was an *ex ante* decision about cost allocation, untainted by fraud or discrimination. In a different line of

cases involving preemption of state regulation, the Supreme Court repeatedly has protected FERC's discretion to modify cost allocations in this way. See, *e.g.*, *Entergy Louisiana, Inc. v. Louisiana Pub. Serv. Comm'n*, 539 U.S. 39, 50 (2003) ("We see no reason to create an exception to the filed rate doctrine for tariffs of this type that would substantially limit FERC's flexibility in approving cost allocation arrangements."); *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 372 (1988). In fact, "[i]gnorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed." *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915). The filed rate doctrine protects parties not from misquoted rates, but from discriminatory or fraudulent ones. It is of no help to the Generators here.

The Generators also complain that to allow FERC to allocate the costs as it has would create a bad precedent. The Commission responds, without data to back it up, that its decision was highly fact-specific and that, in any event, these cases are rare. That is unsatisfying, particularly if we accept for the sake of argument intervenor AWEA's contention that such a decision makes investments less predictable. From our perspective, however, cases must be decided on the basis of their record. We do not know what FERC would have done if a utility had sunk significant money based on reasonable expectations about the costs of a regulated project and then was told that it had to bear additional, unforeseen costs. Much less do we know how we would evaluate an agency decision that was adverse to the utility in such a case. Federal courts do not decide hypothetical cases for a good reason; we leave these questions for another day, when they are properly before us.

To sum up, the interconnection process at issue here includes three studies that give the affected parties multiple opportunities to choose to pursue or to abandon an interconnection agreement. There was an error in the original calculation of the costs that the new capacity proposed by the Generators would entail, and at the Generators' request, FERC resolved the question who should bear those additional costs. The Generators had the option of connecting to the grid at the 120-megawatt level, paying, or walking away. They did not like those options, but FERC's conclusion was based on substantial evidence and was not arbitrary. "[W]hen entities before FERC present intensely practical difficulties that demand a solution, FERC must be given the latitude to balance the competing considerations and decide on the best resolution." *NRG Power Mktg., LLC v. FERC*, 718 F.3d 947, 955–56 (D.C. Cir. 2013) (quotations and citation omitted).

B

We now turn to the Generators' second challenge to the Commission's orders. This one relates to FERC's decision to apply Option 1 pricing for reimbursing the system operator the cost of the original network upgrades and Option 2 pricing for the additional upgrades that were deemed necessary after the mistake was discovered. They argue that Option 2 pricing should apply to the entire package. Recall that under Option 1 pricing, the interconnection customer funds the entire cost of the network upgrades *before* construction, the transmission owner then refunds 100% of the upgrade costs *after* construction, and the customer then pays for the upgrades monthly, through a "network upgrade charge." Under Option 2 pricing, the customer pays for the unreimburs-

able costs of the upgrades before construction, and the
transmission owner retains the funds.

It is not hard to imagine why the Generators prefer Op-
tion 2. Under Option 1, the transmission owner (MISO) re-
pays the full amount of the cost of the network upgrades to
the interconnection customer, but the customer (*i.e.*, Pioneer
and Settlers) must then charge a monthly amount to recover
the costs of the upgrades. Under Option 2, Pioneer and Set-
tlers pay the nonrefundable amount for the interconnection
and then do not have to pay monthly charges to MISO. Once
again, the standard of review is deferential. As the D.C. Cir-
cuit put it, "we defer to FERC's decisions in remedial mat-
ters, respecting that the difficult problem of balancing com-
peting equities and interests has been given by Congress to
the Commission with full knowledge that this judgment re-
quires a great deal of discretion." *Koch Gateway Pipeline Co. v.
FERC*, 136 F.3d 810, 816 (D.C. Cir. 1998) (quotations and cita-
tion omitted).

The Generators contend that the Commission's finding
that Option 1 may be used on the original network upgrades
is contrary to its prior decisions. They rely heavily on *West
Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014), in
which the D.C. Circuit granted an energy company's petition
for review and vacated FERC's order on the ground that the
Commission needed to provide a better explanation for why
certain tariff rates governed that company's interconnection
request. In our view, however, *West Deptford* strengthens the
Commission's position here. The Commission did not apply
Option 1 pricing to the additional upgrades required to con-
nect Pioneer and Settlers's windfarms. It chose to stay the
course for the original upgrades, preserving the same pric-

ing scheme that it originally had approved. It provided reasons for its decision to do so, explaining that grandfathering the existing pricing scheme provided regulatory certainty and was easier to administer. The Commission also discussed how its decision serves the Federal Power Act's purpose of preserving the expectations of parties.

The Generators object that the Commission is being inconsistent, insofar as it rejects a reliance argument for purposes of cost allocation for the mistake and it embraces a reliance argument for this purpose. But we have explained why the reliance argument is at best weak for purposes of cost allocation. And it is hard to complain on the basis of reliance that the Commission did not *change* the pricing scheme for the original parts of the Agreement. We have no reason to think that the Commission misinterpreted its own orders when it decided to bifurcate the pricing options. See *NRG Power Mktg.*, 718 F.3d at 957 ("[W]e afford FERC substantial deference in its interpretation of its own orders.").

As with their first challenge, the Generators also argue that the Commission's decision to apply Option 2 pricing only for the additional upgrades violated the filed rate doctrine. But this argument founders on the fact that "[t]he filed rate doctrine simply does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service." *Natural Gas Clearinghouse v. FERC*, 965 F.2d 1066, 1075 (D.C. Cir. 1992). Once MISO and Ameren filed the amended Agreements with the Commission, both Pioneer and Settlers were on notice. Compare *Shetek Wind Inc. v. MISO*, 138 FERC ¶ 61,250 (2012) (requiring that changes to terms and conditions of service laid out in the tar-

iff be filed with FERC). After FERC handed down its November 2011 decision, both companies knew that the additional network upgrades *could* be priced under Option 1 or 2. Pioneer and Settlers would have to pay for the upgrades under either pricing scheme, and the agency has the discretion to apply the 2011 order accordingly.

Given the standard of review, the choice to grandfather Option 1 was FERC's to make. FERC has the authority to decide to apply one reimbursement scheme for the original upgrades, and a different reimbursement scheme consistent with the regulatory scheme for the additional upgrades. The Commission reasonably interpreted its original order for the approximately $6 million worth of work and the later order for $11.5 million as two different instruments. It did not act arbitrarily in deciding to do so.

### III

We DENY Pioneer and Settlers's petitions for review of the Commission's orders.