# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 17, 2025                    Decided July 1, 2025

No. 24-1039

MICHIGAN ELECTRIC TRANSMISSION COMPANY, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MICHIGAN PUBLIC POWER AGENCY, ET AL.,
INTERVENORS

———

Consolidated with 24-1084

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Aaron M. Streett* argued the cause for petitioner. With him on the briefs were *Jay Ryan*, *J. Mark Little*, and *Christopher E. Tutunjian*.

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General

Counsel, at the time the brief was filed, and *Robert H. Solomon*, Solicitor. *Angela X. Gao*, Trial Attorney, entered an appearance.

*Debra D. Roby* argued the cause for intervenors for respondent. With her on the brief were *Michael J. Rustum*, *Alan I. Robbins*, and *Thomas B. Steiger III*. *Neil H. Koslowe* entered an appearance.

Before: WALKER, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Petitioner Michigan Electric Transmission Company (METC) owns a high-voltage transmission line jointly with two other transmission companies, the Michigan Public Power Agency (MPPA) and the Wolverine Power Supply Cooperative. This case involves ownership of new transmission facilities — referred to as "network upgrades" — that will connect a new solar generation park to the transmission line. The question is which company will own the new facilities, and whether certain existing agreements with the operator of the regional transmission system or among the companies provide the answer. METC claims each agreement grants it exclusive ownership of the network upgrades; MPPA and Wolverine claim no agreement grants METC that exclusive ownership.

The Federal Energy Regulatory Commission held no agreement identified by METC conclusively determined ownership rights and therefore declined to decide the question of ownership. Because we agree with the Commission's inter-

pretation of the relevant agreements, we deny METC's petitions for review.

## I. Background

The Midcontinent Independent System Operator (MISO) runs the electricity transmission system in portions of 15 midwestern and southern states. METC, Wolverine, and MPPA are "Transmission Owners" (TOs) in the MISO system, which means they have conveyed functional control of their transmission facilities (in whole or in part) to MISO. *See* Midcontinent Open Access Transmission Tariff (MISO Tariff), § 1.T, https://perma.cc/8MPS-HWVB. MISO TOs sign a Transmission Owners Agreement (TOA) under which the TO "retains ownership and physical control over [its] facilities, but operates them according to MISO's instructions." *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 248 (D.C. Cir. 2007) (cleaned up).

Under MISO's tariff, all customers pay a "single rate to use the entire MISO transmission system, based upon the volume of power the customer carries on the system." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1365 (D.C. Cir. 2004) (cleaned up). MISO's TOA and tariff operate alongside certain contracts signed prior to the creation of MISO — referred to as Grandfathered Agreements (GFAs) — between TOs and other utilities. *See* MISO Tariff, Attach. P (listing the GFAs). Certain of those agreements, including the GFAs relevant to this case, are "carved out" of the tariff, meaning they are not subject to most tariff requirements. *See id.* §§ 1.C, 1.G (defining "Carved Out GFA(s)" and "Grandfathered Agreement(s)"); §§ 38.8.4–38.8.4.7 (setting out the terms by which carved-out GFAs must abide); *Wis. Pub. Power, Inc.*, 493 F.3d at 253–55.

## A. The Network Upgrade Process

When a generator of electricity (referred to as an Interconnection Customer) in MISO's service area seeks to bring its power to market, it submits a request to interconnect to the MISO transmission grid. MISO then analyzes the request and determines whether any network upgrades are needed to ensure that the new connection does not harm the grid. MISO sends to the Interconnection Customer and the affected TO(s) a pro forma Generator Interconnection Agreement (GIA) that identifies the specific upgrades required and their estimated cost. *See Pioneer Trail Wind Farm, LLC v. FERC*, 798 F.3d 603, 606 (7th Cir. 2015).

The parties negotiate over the appendices to the pro forma GIA, which in this case address, among other issues, the ownership of the network upgrades and the reimbursement of construction costs. Once executed, the GIA becomes effective. If negotiations reach an impasse, however, then any party "may request to end negotiations," after which MISO will submit the unexecuted GIA to the Commission to resolve the disputed issues. MISO Tariff, Attach. X, § 11.2; *see also Standardization of Generator Interconnection Agreements and Procedures*, 104 FERC ¶ 61,103, at ¶¶ 233–235, 296 (2003).

In this case, Eagle Creek Solar Park LLC is developing a 120-megawatt (MW) solar generation facility that will provide power to MISO's grid. MISO determined that interconnection with the grid will require the construction of network upgrades, which will connect the solar park to the grid by way of an existing line known as Styx-Murphy. *See* **Figure 1** (denoting the solar park in green and the Styx-Murphy line in fuschia).

**Figure 1: Network Upgrades for Palomino Line**



The Styx-Murphy line is jointly owned by METC (1%), MPPA (35%), and Wolverine (64%). MPPA and Wolverine acquired their ownership interests in 1992 through separate GFAs with Consumers Energy Company as part of an antitrust settlement to remedy Consumers's market power in the supply of bulk power in Lower Michigan. *See* Belle River Transmission Ownership and Operating Agreement Between Consumers Power Company and the Michigan Public Power Agency (MPPA Agreement), Dec. 1, 1982, App. 197–362; Wolverine Transmission Ownership and Operating Agreement Between Consumers Power Company and Wolverine Power Supply Cooperative, Inc. (Wolverine Agreement), July 27, 1992, App. 364–412. In 2020 METC acquired its ownership interest in the line from Consumers. We shall refer to the agreements collectively as the Styx-Murphy Agreements.

## B. The Ownership Provisions

Negotiations over the proposed GIA for the Eagle Creek solar park include determining which of METC, MPPA, and Wolverine will own what network upgrades, if any. Per METC, three pre-existing agreements purportedly govern those negotiations. The first is the TOA: Appendix B, § VI (hereinafter "§ VI") provides that

> (i) ownership and the responsibility to construct facilities which are connected to a single Owner's system belong to that Owner . . . (ii) ownership and the responsibilities to construct facilities which are connected between two (2) or more Owners' facilities belong equally to each Owner, . . . and (iii) ownership and the responsibility to construct facilities which are connected between an Owner(s)' system and a system or systems that are not part of MISO belong to such Owner(s) unless the Owner(s) and the non-MISO party or parties otherwise agree[.]

The meaning of this provision is at the core of the parties' dispute.

The other two are the Styx-Murphy Agreements. They grant MPPA and Wolverine (1) the right to transmit electricity over the Styx-Murphy line, *see* MPPA Agreement § 1.11; Wolverine Agreement, §§ 1.5, 3.1, and (2) an undivided ownership interest in that line as a tenant in common, *see* MPPA Agreement § 2.1; Wolverine Agreement, § 2.1. The MPPA Agreement also specifies that MPPA's ownership interest is "related to its ownership interest" in the Belle River generation station, § 12.2.1, and the Wolverine Agreement specifies Wolverine's ownership interest "has been acquired to provide Wolverine with the right to transmit 105 MW over Consumers' transmission system," § 2.1.

During negotiations over the proposed GIA, MISO, Eagle Creek, METC, MPPA, and Wolverine were unable to reach an agreement on the ownership of any of the network upgrades identified by MISO apart from two that all agree will be owned solely by METC.

## C. The Proceedings Before the Commission

In July 2023, MISO submitted a proposed GIA to the Commission to address this dispute, explaining that Eagle Creek could not make a decision about proceeding with its solar facility until the dispute was resolved. The proposed GIA would have assigned the ownership of the network upgrades equally between METC, MPPA, and Wolverine pursuant to § VI(ii) of the TOA. MPPA and Wolverine supported this proposal. METC, on the other hand, opposed the proposal, arguing MPPA and Wolverine do not have any ownership rights in the network upgrades.

According to METC, the Styx-Murphy Agreements do not provide for those rights, and only those Agreements could be a basis for ownership of the network upgrades because § VI of the TOA was not intended to address issues related to the ownership of network upgrades necessitated by the generator interconnection process. METC therefore asked that the Commission hold MPPA and Wolverine ineligible for owner-ship of the network upgrades and direct MISO to execute a three-party agreement among itself, Eagle Creek, and METC.

After multiple submissions from METC, MPPA, and Wolverine, the Commission declined to determine ownership rights and rejected the GIA without prejudice to MISO's filing another GIA. *Midcontinent Indep. Sys. Operator, Inc.*, 185 FERC ¶ 61,182 (2023). It first concluded MISO incorrectly relied upon § VI(ii) of the TOA to determine ownership rights because that clause applies only when network upgrades are

being connected "between two (2) or more [Transmission] Owners' facilities." It also disagreed with METC's argument that the Styx-Murphy Agreements excluded MPPA and Wolverine from having an ownership interest in network upgrades, finding instead that "nothing in the GFAs prohibit them from owning generator interconnection-related network upgrades" or "limit [their] ownership interest to their transmission capacity entitlements[.]" *Id.* at ¶¶ 83–84. In sum, the Commission held no provision instanced by the parties determined ownership of the network upgrades.

METC petitioned for a rehearing, arguing for the first time that Clause (i) of § VI unambiguously grants it ownership of the contested network upgrades. Only it, per METC, is a TO that owns a "system" as that term is used in Clause (i). In its view, the jointly-owned Styx-Murphy line is a "facility," not a "system." It also reiterated its arguments that the Styx-Murphy Agreements preclude MPPA and Wolverine from owning any of the network upgrades. The Commission rejected both these positions. *Midcontinent Indep. Sys. Operator, Inc.,* 187 FERC ¶ 61,015 (2024) (Rehearing Order). The Commission again "decline[d] to determine ownership rights," leaving it to the TOs to negotiate ownership of the network upgrades among themselves. METC then petitioned this court for review of both Commission decisions.

Four months after the Commission denied rehearing, MISO submitted an updated proposed GIA to the Commission with a "placeholder" provision for joint ownership of the network upgrades. *See MISO, Inc.*, FERC Dkt. ER24-2900 (Aug. 28, 2024). The Commission accepted this GIA for filing. *See id.* (Oct. 7, 2024) (letter order). When asked at oral argument, counsel for METC reported that, despite the ownership being unresolved, METC is now building the network upgrades. Oral Arg. Tr. 5:19–23. Eagle Creek is initially

funding a large portion of the construction costs, for which it may later be reimbursed per the 2024 GIA, Ex. A9 (explaining its eligibility for 100% reimbursement pursuant to Attachment FF, § III.A.2.d.4 of the TOA).

## II.    Analysis

METC reiterates here the arguments it made in its request for rehearing by the Commission: Section VI(i) of the TOA and the Styx-Murphy Agreements each independently compels the conclusion that METC is the sole owner of all the disputed network upgrades.

## A. Standing and Ripeness

Under Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), we have jurisdiction to review a petition only from a party "aggrieved" by an order of the Commission. A party is "aggrieved" if it makes "the same showing of injury that suffices to establish standing" under Article III of the Constitution of the United States. *San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 136 (D.C. Cir. 2019). That is, the petitioner must show it (1) suffered an injury in fact, (2) that is fairly traceable to the challenged agency action, and (3) will likely be redressed by a favorable decision. *Kan. Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

The Commission argues that METC does not have standing because the Commission rejected the proposed GIA to which METC had objected, in effect ruling in METC's favor. *See Showtime Networks Inc. v. FCC*, 932 F.2d 1, 4 (D.C. Cir. 1991). That is, "the substance of the [Commission's] decision itself" did not result in an injury-in-fact, and therefore does not support METC's standing. *New England Power Generators Ass'n v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013).

The Commission is incorrect. To be sure, "neither a FERC decision's legal reasoning nor the precedential effect of such reasoning confers standing unless the substance of the decision itself gives rise to an injury in fact." *Id.* at 369. Here the Commission, on the way to declining to determine ownership rights, rejected METC's claim that it has exclusive ownership of the network upgrades. As METC puts it, the Commission's decision is equivalent to a dismissal without prejudice despite METC's request for, in effect, a dismissal with prejudice. *See El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 885 (D.C. Cir. 2014) ("Even though [appellant] prevailed on the counterclaim, it is within its rights to 'appeal a dismissal without prejudice on the grounds that it wants one with prejudice'" (quoting *Sea–Land Serv., Inc. v. DOT*, 137 F.3d 640, 647 n.4 (D.C. Cir. 1998))).

As a result, METC must now engage in complex and costly negotiations with MPPA and Wolverine that would not otherwise be necessary. METC's continuing inability to ascertain its ownership share also means it "cannot estimate the eventual amount of financial return from the project," METC Reply Br., Declaration of Andrew Jamieson ¶ 8, which hinders "its present ability to plan for capital expenditures and financing," *id.*

This harm is not, as the Commission argues, attenuated or hypothetical. Rather, it has "a present injurious effect on [METC's] business decisions[.]" *Great Lakes Gas Transmission Ltd. v. FERC*, 984 F.2d 426, 430 (D.C. Cir. 1993). Because its injury would be redressed if this court were to hold that it alone owns the network upgrades, it has standing to pursue its claim here.

The Commission also argues this petition is not ripe for review because any injury to METC "depends on the

[Commission] later accepting, over [METC's] objection, an interconnection agreement reflecting shared ownership of the contested network upgrades." FERC Br. 35. In other words, METC has suffered no imminent injury.

Here the Commission has merely "repackaged its standing argument" as a ripeness argument. *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). "Our discussion of standing dooms that contention," *id.*; for, as we have seen, the Commission's decision not to determine ownership rights imposes a present injury on METC.

## B. The Relevant Agreements Do Not Give METC Exclusive Ownership of the Network Upgrades.

An order by the Commission will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is deferential to the agency; we must uphold decisions that are reasonable and reasonably explained." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 368 (D.C. Cir. 2024) (cleaned up).

We previously "have deferred to [the Commission's] reasonable interpretation of ambiguous tariffs and contracts within its jurisdiction" under principles of deference that are "*Chevron*-like" in nature. *NextEra Energy Res.*, 118 F.4th at 368 (referring to *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843–44 (1984)). We need not decide whether those principles survive the overruling of *Chevron* in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), because "[the Commission's] interpretation of the disputed provisions of the [relevant agreements] are in fact correct." *Id.*

### 1. Exclusive Ownership Under the TOA

As in its request for rehearing, METC argues MPPA and Wolverine are ineligible for ownership of the network upgrades as owners of the jointly-owned Styx-Murphy line because only METC's transmission network, and not the line, qualifies as a "system" within the meaning of § VI(i) of the TOA. As detailed above, § VI provides in relevant part that ownership of facilities:

> [i] which are connected to a single Owner's system belong to that Owner . . . [ii] which are connected between two (2) or more Owners' facilities belong equally to each Owner, unless such Owners otherwise agree . . . and [iii] which are connected between an Owner(s)' system and a system or systems that are not part of MISO belong to such Owner(s) unless the Owner(s) and the non-MISO party or parties otherwise agree.

As discussed, the Commission rejected METC's argument, reasoning that because the Styx-Murphy line is jointly owned, and § VI does not address the interconnection of network upgrades to a jointly owned system, no provision of § VI applies to this situation.

METC argues the Styx-Murphy line should properly be understood as a "facility" within METC's broader system — and not as a "system" itself. The premise of its argument is that "[t]he TOA uses the words 'system' and 'facilities' to mean different things." Whereas the Styx-Murphy line is a jointly owned facility to which no provision of § VI applies, METC argues it alone among the contending parties owns a collection of facilities that qualifies as a "system" under § VI. Moreover, METC contends it is the "single Owner" of this "system," so that § VI(i) grants it exclusive ownership of the network upgrades.

Let us take a step back to view this issue in context. The meaning of the TOA is governed by Delaware law. "When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021); *see also Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 827 (2021) ("A tariff provision must be understood according to its plain meaning, which we draw from its text and context"). It is important to interpret contracts "as a whole . . . so as not to render any part of the contract mere surplusage" or "to render a provision or term meaningless or illusory." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals,* 213 A.3d 39, 56 (Del. 2019) (cleaned up).

METC is correct, of course, that Clauses (i) and (ii) of § VI revolve around different terms, respectively "system" and "facilities." Its argument that the MISO signatories intended these two terms always to mean different things, despite its appeal in the abstract, is unconvincing — indeed unworkable — as applied. METC proceeds from a dictionary definition of "system" as "a regularly interacting or interdependent group of items forming a unified whole." MERRIAM-WEBSTER (2025), https://perma.cc/T8AZ-GJVJ. It follows, per METC, that a "system" must be the aggregation of facilities into something larger, which excludes the Styx-Murphy line. But that line is itself the aggregation of an "interdependent group of items." *See* Wolverine Agreement, Ex. A (listing the "structures, equipment and facilities" of the Tittabawassee-South line, now known as the Styx-Murphy line). The definition METC relies upon therefore does not demarcate as sharp a distinction between a "system" and a "facility" as METC would like.

Perhaps for that reason, METC does not attempt to draw a line between a "system" and a "facility" generally, instead arguing only that the Styx-Murphy line cannot be characterized

as a "system." Rather than the dictionary definition, METC here relies primarily upon passing references, in Commission orders from this and prior cases, to METC's "system" and to the Styx-Murphy "facility." METC Br. 24–25 (collecting references). The orders METC cites, however, merely refer to METC's "transmission system" and the Styx-Murphy line as a "facility" without reference to § VI; indeed, nothing in those orders turned upon the definition of these words. *See, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 106 FERC ¶ 61,219, at ¶ 16 (2004) (finding the continued use of transmission service rights pursuant to the Styx-Murphy Agreements just and reasonable in a settlement agreement about a joint pricing zone); *Mich. Pub. Power Agency*, 128 FERC ¶ 61,268, at ¶ 2 (2009) (resolving a dispute over allocation of certain charges under the Michigan Joint Zone settlement agreement). As a result, although METC is correct that the Commission's interpretation of a tariff provision in a prior order is relevant to its interpretation of an analogous provision at a later date, *see N.Y. Power Authority & Hudson Transmission Partners, LLC v. FERC*, 109 F.4th 550, 557–58 (D.C. Cir. 2024), no prior order here decided an issue that bears upon the interpretation of § VI.

A better and more harmonious reading of § VI and of the MISO TOA as a whole supports the Commission's conclusion that the Styx-Murphy line qualifies as a "system" because the signatories did not intend for "system" and "facilities" always to mean different things. Begin with the Commission's observation that the definition of Transmission System in the TOA "meaningfully inform[s]" the interpretation of "system" in § VI of the Appendix thereto. A Transmission System includes "[t]he transmission facilities of the Owners which are committed to the operation of MISO" and that meet certain conditions. MISO Tariff, § 1.T. This definition indicates that a

"system" is not an abstract entity but is rather a tangible collection of facilities.

METC would have us stop there, arguing a "system" cannot be just one facility. METC Reply Br. 13. Not so. As the Commission pointed out, the owner of a single facility committed to the MISO Transmission System is a TO, so any reading of "system" in § VI(i) to apply only to an Owner of multiple facilities would prevent any ownership of a network upgrade by a TO with a single facility. Rehearing Order, 187 FERC ¶ 61,015, at ¶ 37 n.90 (citing *Republic Trans., Inc.*, 161 FERC ¶ 61,036 (2017)). It would make no sense for the other TO signatories or for MISO itself to discriminate in this manner against the Owner of only one facility.

METC's other arguments against the relevance and substance of the definition of "Transmission System" in the tariff are unpersuasive. METC first argues reliance upon this defined term "override[s] Section VI's clear delineation between 'system' and 'facilities,'" which are undefined terms. METC Br. 29. But METC starts from a false premise: as we have seen, the delineation between these two undefined terms in § VI is hardly clear.

METC's next argument, that the definition of "Transmission System" cannot support the Commission's interpretation because that term refers to the collective MISO system and not to a single facility, fares no better. Although METC may be correct that "Transmission System" refers to the overall MISO system, the Commission did not import that definition into § VI. Instead it determined that the definition of "system" in § VI should not be understood to exclude a single transmission line.[1] Indeed, even METC's "system" is a subset

---

[1] The Commission also argues that it appropriately looked to the definition of "Transmission System" in MISO's unexecuted GIA to

of the larger MISO Transmission System. It is therefore unsurprising that a "system" as used in § VI may be a subset of a larger "system."

The structure of § VI also supports the Commission's interpretation. Consider a situation in which a network upgrade will connect the facilities of two Owners and those facilities sit within a third Owner's "system." As the Commission concluded, METC's rigid distinction between "system" and "facility" would mean that both Clause (i) and Clause (ii) would apply to this situation, and METC could obtain owner-ship of the network upgrades — despite not owning the facili-ties to which the network upgrade would connect — "simply because that existing facility was located within its 'system.'" That result "would ignore the ownership, and responsibilities, of the actual owner(s) of the existing transmission facilit(ies)" and "would render . . . section VI(ii) . . . meaningless." Indeed, this scenario would be avoided if the signatories used "system" and "facility" interchangeably, in which case only Clause (ii) would apply.

METC responds that this argument is purely hypothetical and could be avoided with "interpretive principles," but the better reading of § VI is one that "gives effect to all of [the provisions of § VI] and . . . avoids rendering any provision meaningless." *Okla. Gas & Elec. Co.*, 11 F.4th at 828–29 (cleaned up). The Commission's interpretation of § VI does this.

METC attempted to evade this scenario at oral argument by positing that Clause (ii) applies only to a "facility" connecting two different "systems" within the MISO

bolster its interpretation of "system." Because that definition is not in the TOA itself, we do not find it probative of the definition of "system" in § VI.

Transmission System, such as between a system in Iowa and a system in Wisconsin. If so, METC argues Clause (ii) would not apply to the interconnection of network upgrades between the facilities of two Owners where those facilities sit within a third Owner's "system." This view actually cuts against METC: First, it conflates the meaning of "system" and of "facility": METC argues that Clause (ii) applies to multiple MISO "systems," but that provision speaks of "facilities." Second, the orders METC cited in support merely hold that Clause (ii) was correctly applied to the interconnection at issue in that order. They did not foreclose applying that clause to the connection of network upgrades between two facilities that are located within a single system. *ITC Midwest, LLC v. Am. Transmission Co.*, 142 FERC ¶ 61,096, at ¶¶ 38–39, 41 (2013); *Xcel Energy Servs. Inc. v. Am. Transmission Co.*, 140 FERC ¶ 61,058, at ¶¶ 58–61 (2012), *reh'g denied* 147 FERC ¶ 61,089 (2014); *Pioneer Transmission, LLC v. N. Ind. Pub. Serv. Co.*, 140 FERC ¶ 61,057 (2012).

Finally, METC again makes the argument that because Clause (i) addresses the connection of a network upgrade to a "system" and Clause (ii) addresses the connection of a network upgrade to "facilities," these two terms must always mean different things. That argument, however, ignores Clause (iii), which addresses the connection of network upgrades "between an Owner(s)' system and a system or systems that are not part of MISO." Clauses (ii) and (iii) use "facilities" and "system" to describe the objects to which a network upgrade connects even though the key distinction between these provisions is whether a connection is being made between two MISO members or between a MISO member and a nonmember. METC makes no attempt to reconcile Clause (iii) with its interpretation of Clause (i).

The Commission made a somewhat different point in its brief, asserting that "[t]he meaningful distinction in Section VI is the number of Midcontinent Owners at the points of interconnection." FERC Br. 42. METC contends this point cannot be found in the Commission's decisions and is therefore a post-hoc rationalization that this court cannot consider. METC Reply Br. 15 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)). We, however, do not rely upon the point in the Commission's brief; instead, we simply observe that Clause (iii) bolsters the Commission's holding in the Commission's Rehearing Order that § VI uses "system" and "facilities" interchangeably.

In sum, we agree with the Commission that the Styx-Murphy line is a "system" as that term is used in § VI(i). Because METC is not the "single" Owner of that line, its claim to exclusive ownership of the network upgrades fails.

### 2. The Styx-Murphy Agreements

As an alternative to its arguments about the MISO TOA, METC contends the overall "language and intent" of the Styx-Murphy Agreements preclude MPPA's and Wolverine's ownership of network upgrades. As mentioned in Part I.B, METC cites as support for this view the provisions granting those TOs the right to transmit power over the Styx-Murphy line, awarding them an ownership interest in the line, and specifying both that MPPA's ownership interest is "related to its ownership interest" in the Belle River generation station and that Wolverine's ownership interest "has been acquired to provide Wolverine with the right to transmit 105 MW over Consumers' transmission system." METC argues those provisions create "limited grants of ownership in specified facilities" only to transmit specified amounts of power over Consumers's (now METC's) network. METC Br. 39. METC also claims the

origin of the Agreements as a product of an antitrust settlement further supports its position; the Agreements were intended only to prevent Consumers from denying competitors market access. It would therefore be wrong, per METC, to read the Agreements as "convey[ing]" to MPPA and Wolverine any ownership interest in network upgrades. *Id.*

Michigan law governs the interpretation of the Styx-Murphy Agreements. "The cardinal rule" in interpreting a contract is to determine the intent of the parties. *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 702 N.W.2d 106, 113 (2005) (cleaned up) (Cavanagh, J.). "[I]f the language of the contract is clear and unambiguous, it is to be construed according to its plain sense and meaning." *Zahn v. Kroger Co. of Michigan*, 483 Mich. 34, 764 N.W.2d 207, 211 (2009). A Michigan court "will not create ambiguity where the terms of the contract are clear." C*ity of Grosse Pointe Park*, 702 N.W.2d at 113 (cleaned up).

Contrary to METC's characterization, the Commission did not determine the Styx Murphy Agreements "convey" ownership in the network upgrades to MPPA and Wolverine. Rather, the Commission examined the Styx Murphy Agreements and found "nothing in the [Agreements] *prohibit* [MPPA and Wolverine] from owning interconnection-related network upgrades." (Emphasis added.)

It is clear that none of the specific provisions to which METC points in any way bars the ownership of network upgrades. METC accordingly argues the contracts as a whole and their antitrust origin demonstrate an intent to impose that bar. We think not. The Agreements as a whole granted MPPA and Wolverine each, for the purpose of transmitting power on the Styx-Murphy line, both a capacity entitlement and an undivided ownership interest in the line as a tenant in common,

which means they may transmit power across the Styx-Murphy line and may do so as an owner of the line. *See Tenancy in Common*, *Black's Law Dictionary* (6th ed. 1990) (defining a "tenancy in common" as "[a] form of ownership whereby each tenant (*i.e.,* owner) holds an undivided interest in property" with no right of survivorship). Nothing in the Agreements suggests these owners are unlike any other joint owner with respect to the ownership of network upgrades along their line.

Nor does the history of these Agreements provide any support for METC's position. We proceed from METC's explanation that the Styx-Murphy Agreements were the product of an antitrust settlement, intended to remedy Consumers's market power in the supply of bulk power in Lower Michigan. The Agreements were therefore intended to guarantee MPPA's and Wolverine's ability to transmit power to their customers and, per METC, nothing more.

As an initial matter, it is unclear whether the history of the Agreements should inform our analysis here. METC does not claim the Agreements are ambiguous, and relatively recent Michigan case law says a "clear and unambiguous" contractual term is to be construed "according to its plain sense and meaning." *Zahn*, 764 N.W.2d 207, 211 (2009); *but see W. O. Barnes Co., Inc. v. Folsinski*, 337 Mich. 370, 60 N.W.2d 302, 306 (1953) (explaining a court must construe a contract in light of the parties' purpose "as indicated by the language used, read in the light of the attendant facts and circumstances").

In any event, we do not agree that the history of the Agreements has the significance METC suggests. If the parties intended the Agreements narrowly to "eliminate Consumers's ability to exclude its competitors in the generation market from using its lines," METC Br. 40 (cleaned up), the Agreements could have included only the right for MPPA and Wolverine to

transmit power over the Styx-Murphy line. That the Agreements also grant the TOs a tenancy in common suggests that unrestricted pro rata ownership in the Styx-Murphy line would enable them to compete on an equal footing with other TOs, for example by exercising their right to build network upgrades when doing so would be advantageous. Limiting the Agreements as METC requests, therefore, could only help entrench rather than restrain METC, an effect at odds with the pro-competitive purpose of the agreements.

In sum, reading the Agreements to prevent the ownership of network upgrades would extend the terms related to transmission over, and ownership of, the Styx-Murphy line to circumstances that are unmentioned and unlike those the Agreements do address. Although METC claims it is merely interpreting the Agreements as written, we agree with the Commission that METC in essence would add to the Agreements a new prohibition against ownership of network upgrades. That, however, we cannot do. *Zahn*, 764 N.W.2d at 211 (stating a court "may not make a new contract for parties under the guise of a construction of the contract, if doing so will ignore the plain meaning of words chosen by the parties").

### III.    Conclusion

For the foregoing reasons, the petitions for review are

*Denied.*